112 A.3d 613

JAMES SCHROEDER, PLAINTIFF, v. COUNTY OF ATLANTIC, BOARD OF CHOSEN FREEHOLDERS OF THE COUNTY OF ATLANTIC, AND FORD–SCOTT & ASSOCIATES, LLC, DEFENDANTS.

Superior Court of New Jersey
Law Division Atlantic County

Decided December 3, 2014.

252

*Bard L. Shober,* for plaintiff.

*James F. Ferguson,* County Counsel, for defendant County of Atlantic.

*Roger C. Steedle* for defendant Board of Chosen Freeholders of the County of Atlantic (*Law Offices of Roger C. Steedle, P.A.,* attorneys).

*Benjamin Zeltner* for defendant Ford–Scott & Associates (*Levine, Staller, Sklar, Chan & Brown, P.A.,* attorneys).

MENDEZ, A.J.S.C.

A verified complaint in lieu of prerogative writ and order to show cause was filed on May 29, 2014, by plaintiff against the defendants. Plaintiff claims that defendants have violated Ordinance No. 10, Atlantic County's "pay to play" ordinance, in awarding Ford–Scott & Associates (hereinafter "Ford–Scott") a county contract after the firm had contributed monies to Sheriff Frank Balles' State Senate campaign. For the reasons set forth in this opinion, the court finds that defendants have violated Ordinance No. 10. The court grants the plaintiff's request for relief, ordering the imposition of the Section 7(b) penalty disqualifying Ford–Scott from eligibility for future Atlantic County contracts for a period of four calendar years from the date the complaint was filed. The court denies plaintiff's request for relief declaring the Ford–Scott contract awarded under Resolution 219–2014 null and void and orders payment for services performed under the contract.

## FACTUAL AND PROCEDURAL BACKGROUND

On or about September 25, 2007, defendant County of Atlantic (hereinafter "Atlantic County") adopted Ordinance 10–2007 (hereinafter the "ordinance"), the County's "pay-to-play" ordinance. The ordinance places limitations on the County's ability to award a contract to any "professional business entity" that contributed more than $300 to "any campaign committee for any elective County office or to the current holders of any elective County office" within one calendar year preceding the date of the contract. The ordinance also prohibits any professional business entity under contract with the County from making any contribution to "any campaign committee for any elective County office or to current holders of any elective county office" during the duration of the contract.

Defendant Ford–Scott is a New Jersey limited liability company in Ocean City, New Jersey. Ford–Scott was under contract with Atlantic County to serve as the County's external auditor during 2013, to perform the 2012 annual audit. During the 2013 year, Ford–Scott made four political contributions, including contributions to the following: (1) Friends for Chris Brown, on May 15, 2013; (2) Lobiondo for Congress, on June 10, 2013; (3) Friends of Balles, Amodeo & Brown, on September 26, 2013; and (4) Friends of Frank Balles for Senate, on March 15, 2013. Balles, the recipient of the fourth contribution listed above, was and is the Sheriff of Atlantic County. At the time of the donations in 2013, Balles was also running for State Senate.

The next year, on or about April 2, 2014, Ford–Scott submitted an application to Atlantic County to perform the 2013 annual audit, which included a "Political Contribution Disclosure Form," as required by *N.J.S.A.* 19:44A–20.26. The disclosure form disclosed the aforementioned contributions. On April 15, 2014, in an eight-to-one vote, Atlantic County adopted Resolution 219, awarding Ford–Scott the contract to perform the 2013 annual audit. At the hearing held on April 15, at least one board member expressed their opinion that the contributions violated the ordinance. The

text of the resolution states that Ford–Scott had not made any disqualifying political contributions.

Plaintiff is a resident and taxpayer of Atlantic County. He filed an order to show cause and prerogative writ on May 29, 2014, before this court, forty-four days after the passing of Resolution 219, and after Ford–Scott had completed the audit. The audit was performed between the resolution approving the audit on April 15, 2014, and the date of filing the complaint on May 29, 2014. On June 9, 2014, this court entered an order granting plaintiff's request for temporary restraints, setting a briefing schedule, and setting a return date. The order temporarily restrained Atlantic County from awarding any new contract to Ford–Scott and from issuing any payments to Ford–Scott, including payments for services that have already been rendered. These temporary restraints were entered subject to Ford–Scott's right to request a dissolution of the temporary restraints at any time. A final hearing in this matter was heard on August 18, 2014, during which the parties expressed their positions, as detailed below.

Plaintiff argues that the contributions made by Ford–Scott in 2013 were prohibited both because the contributions were made during the duration of Ford–Scott's 2013 contract, and because the contributions were made within one year of the date of the 2014 contract. Therefore, plaintiff argues that the County's decision to award Ford–Scott the 2014 contract was arbitrary, capricious, and in violation of the ordinance. Plaintiff argues that, pursuant to the ordinance, the contract is "declared null and void" and Ford–Scott must be disqualified from eligibility for future contracts with Atlantic County for four years. Plaintiff seeks an order declaring as much, and enjoining Atlantic County from paying Ford–Scott for any services performed under the voided contract, and ordering Ford–Scott to return the monies received under the contract.

Although Ford–Scott's contributions to Balles were made to Balles' campaign for State Senate rather than for Sheriff, plaintiff argues that the public policy considerations behind the ordinance would be subverted if these contributions were permitted:

Thus, allowing professional business entities to make contributions in violation of the Ordinance to the holders of elective County office simply by making those contributions to a campaign for another office does nothing to assuage the reasonable concerns of the taxpayers as to their trust in government contract nor does it establish an effective maximum amount of donations that can be made. Every elected County official could open campaign accounts for a variety of non-county offices and accepted unlimited contributions from professional business entities while at the same time awarding them no-bid public contracts. It is an exception that literally renders the Ordinance illusory.

On the other hand, all of the defendants argue that the ordinance was intended to preclude influence-seeking contributions to those acting in their role as county official or as candidates for specifically designated elective county offices. In Atlantic County's view, the ordinance was never intended to preclude campaign contributions to those running for state office. Similarly, defendants argue that the ordinance has no applicability to the campaign contributions at issue, as those contributions were made to a candidate for state office, the provisions of which defendants argue are governed by state contribution and campaign finance laws. In other words, defendants argue that plaintiff's interpretation of the ordinance is preempted by state law. Lastly, defendants argue that the doctrine of laches applies, in that plaintiff waited until Ford–Scott had completed the audit until he filed suit.

## DISCUSSION

### I. LACHES DOES NOT BAR THE COURT'S CONSIDER-ATION OF THE MERITS OF THIS CASE.

■ It is well-settled law that the final decisions of a county government may be challenged by an action in lieu of prerogative writs. *See, e.g., R.* 4:69–1. *Warren v. Bd. of Freeholders,* 386 *N.J.Super.* 194, 899 *A.*2d 1028, *certif. denied,* 188 *N.J.* 354, 907 *A.*2d 1014 (2006); *Aparin v. County of Gloucester,* 345 *N.J.Super.* 41, 783 *A.*2d 271 (Law Div.2000). A prerogative writ action must be filed within forty-five days. *R.* 4:69–1. The New Jersey Supreme Court has ruled that, when a statute of limitation is expressly provided for, the doctrine of laches shall not apply to such an action, unless there exist overwhelming equitable con-

cerns. *Fox v. Millman,* 210 *N.J.* 401, 417–18, 45 *A.*3d 332 (2012) (holding that laches could not bar an action that was commenced within the applicable six-year statute of limitations). In *Fox,* the court stated that laches "is an equitable remedy that [we have] frequently described as an equitable defense that may be interposed in the absence of the statute of limitations." *Id.* at 418, 45 *A.*3d 332 (citing *Borough of Princeton v. Bd. of Chosen Freeholders,* 169 *N.J.* 135, 157, 777 *A.*2d 19 (2001)).

In this case, plaintiff filed suit forty-four days after Ford–Scott was awarded the subject contract by resolution. This is within the timeframe prescribed by *Rule* 4:69–1, which allows for filing within forty-five days. However, by the time the complaint was filed, Ford–Scott had already performed the audit for 2014. Ford–Scott was aware that at least one of the freeholders had expressed reservations about the legality of the contract, and raised concerns about the awarding of the contract violating the pay-to-play ordinance. In the court's view the law is clear that the doctrine of laches shall not apply if the complaint is filed within the time proscribed by the court rule, unless there are overwhelming equitable concerns. In this case the court finds that there are not overwhelming equitable concerns. In the court's opinion, the equities in this case do not present a situation which merits deviation from the *Fox* decision.

II. THE PURPOSE OF ORDINANCE NO. 10 IS TO REGULATE POLITICAL CONTRIBUTIONS TO ANY CAMPAIGN FUND, COUNTY OR STATE, OF A CURRENT HOLDER OF ANY COUNTY ELECTED OFFICE.

■ A question of statutory interpretation begins with its plain language. When the language of a legislative enactment is clear on its face and subject to only one meaning, the analysis stops there. *See, e.g., Real v. Radir Wheels,* 198 *N.J.* 511, 524, 969 *A.*2d 1069 (2009). However, when the legislative enactment is subject to more than one reasonable interpretation, a court must look to the legislative intent of the enactment. *Ibid.* (holding that if there

is ambiguity in statutory language, the court may turn to extrinsic evidence, including legislative history, committee reports, and contemporaneous construction). The court's duty "is to apply the legislative intent as expressed in the statute's language, and [the court is] not to presume that the Legislature intended something other than what it expressed by its plain language." *In Re Jamesburg High Sch. Closing*, 83 *N.J.* 540, 548, 416 *A.*2d 896 (1980). In other words, the court's duty is to assess the plain language in light of the circumstances surrounding the ordinance's enactment, in conjunction with the underlying policy and purpose.

The relevant legislative enactment in this case is Ordinance No. 10. More specifically, the provisions at issue in this case are Sections 2(a) and 2(b) of Ordinance No. 10. The plain language of those provisions reads as follows:

Section 2. Prohibition on Awarding Public Contracts to Certain Contributors

(a) To the extent that it is not inconsistent with State or Federal Law, Atlantic County or any of its purchasing agents, departments or instrumentalities of the County thereof, as the case may be, will not enter into any agreement or otherwise contract to procure professional, banking, insurance coverage services or any any other consulting services provided by a licensed professional, including those awarded pursuant to any process including a fair and open process, if such professional business entity has solicited or made any contribution of money or pledge of a contribution, including in-kind contribution to (i) *any campaign committee of any candidate for elective County office or to the current holders of any elective County office* . . .

(b) No Professional business entity who submits a proposal for; enters into negotiations for or agrees to any contract or agreement including those awarded by a "fair and open process" pursuant to *N.J.S.A.* 19:44A-20 et seq. for the rendition of professional services as the case may be, shall knowingly solicit or make any contribution of money, pledge of contribution, including in kind contributions to: (1) *any campaign committee of any candidate for elective County office or to the current holder of any elective County office* . . .

[emphasis added].

The operative phrase in these two provisions is "any campaign committee of any candidate for elective County office or to the current holder of any elective County office." The latter half of this provision is at issue. The dispute rests on the type of campaign to which contributions are subject to the ordinance. Plaintiff argues that this provision should be read to prohibit the

contribution of funds to the current holder of any elective county office who is running for any office, including a state office. Defendants argue that "the current holder of any elective County office" is a term of art included only to ensure that a holder of a county office cannot accept money during the years of service that his position is not up for reelection, despite the fact that he is likely still raising money for a future election for a county office. The purpose of this is to level the playing field among prospective candidates and currently elected candidates. Defendants argue that Ordinance No. 10 only applies to the campaign contributions for county elected offices and does not apply to campaign contributions to state or other non-county campaigns. Finally, Ford–Scott argues that because the ordinance is open to multiple, conflicting interpretations, it is unconstitutionally vague and therefore void ab initio.

Reading Section 2 in isolation, the court is of the opinion that the plain language does not by itself, without looking at the legislative history and the ordinance as a whole, provide a clear answer to the issue at hand. Where the plain language of an ordinance is not clear on its face, the court is charged with looking to the legislative intent behind the enactment. Sources of legislative intent include the language of a statute, the policy behind a statute, concepts of reasonableness and legislative histories. *Shapiro v. Essex Cnty. Freeholders Bd.*, 177 *N.J.Super.* 87, 93, 424 *A.*2d 1203 (Law Div.1980), *aff'd*, 183 *N.J.Super.* 24, 443 *A.*2d 219 (App.Div.), *aff'd*, 91 *N.J.* 430, 453 *A.*2d 158, (1982).

The public policy concerns surrounding the adoption of this ordinance were clearly spelled out by the Atlantic County Board of Chosen Freeholders in the preamble of Ordinance No. 10:

WHEREAS large political contributions from those seeking or currently performing business with the County, raise reasonable concerns on the part of taxpayers and residents as to their trust in government contracts; and

WHEREAS it has become common for individuals/entitites to make substantial political contributions to persons holding elective County office who are ultimately responsible for awarding professional service contracts which are not subject to public bidding; and

WHEREAS, pursuant to P.L.2005 c. 271 the County is authorized to adopt Ordinances limited the award of public contracts to professional business entitites that have made political contributions and may limit contribution amounts that professional business entities can make during the term of a contract; and

WHEREAS, in the interest of good government, the County desires to set maximum amounts that professional business entitites may conribute politically beyond which they become ineligible to receive a contract from the County; and

WHEREAS, the County governing body has determined that the flow of excess poltical contributions into Atlantic County from sources located outside Atltantic County via a process known as wheeling is likely to be a corrupting influence on the political process in AtlanticCounty; and

WHEREAS, the governing body of Atlantic County desires to curb the process known as wheeling by placing limits on the amounts of political contribution that a candidate for elective County office may receive . . .

In the court's opinion, the following provisions demonstrate the true legislative intent of the Board of Chosen Freeholders:

WHEREAS large political contributions from those seeking or currently performing business with the County, raise reasonable concerns on the part of taxpayers and residents as to their trust in government contracts; and

WHEREAS, it has become common for individuals/entitites to make substantial political contributions to persons holding elective County office who are ultimately responsible for awarding professional service contracts which are not subject to public bidding;

WHEREAS, in the interest of good government, the County desires to set maximum amounts that professional business entities may contribute politically beyond which they become ineligible to receive a contract from the County;

The colloquy between the Freeholders at a meeting held on August 28, 2007, leading up to the enactment of Ordinance No. 10 in September of 2007, is also indicative of the reasoning behind passing the pay-to-play ordinance. In describing the purpose of this type of ordinance, Mr. Harry Pozycki [1] stated: " 'pay-to-play' is a very narrow law directed at keeping honest the government contracting system. Keeping it away from the influence of a large political contributions." Chairman Silipena then asked Pozycki if the proposed ordinance was "strictly for county elected officials" to which Pozycki responded "[i]t is for county contractors, and

---

[1] Pozycki is the founder of The Citizens Campaign, a non-profit organization in New Jersey that, among other things, helped develop the state pay-to-play statute and works with local governments to enact pay-to-play ordinances.

there's one provision in it that applies to the county elected officials." Pozycki then pointed to the case of *Blount v. SEC*, 314 *U.S.App.D.C.* 52, 61 *F.*3d 938 (D.C.Cir.1995), *cert. denied*, 517 *U.S.* 1119, 116 *S.Ct.* 1351, 134 *L.Ed.*2d 520 (1996), to explain that the courts have deemed pay-to-play ordinances constitutional, finding that governments not only have the right to regulate contributions through these ordinances, but that they have a responsibility in order to protect the integrity of their contracting systems. Pozycki then stated "if you want to do business with the government, you can make the contributions permitted."

Defendants argue that this colloquy means that because the Freeholders thought only county elected officials and contractors pursuing county contracts were to be subject to Ordinance No. 10, only donations related to campaigns for county office were contemplated. The court disagrees. The discourse never specifically discusses the types of campaigns for which contributions would be subject to the proposed ordinance, but rather the county elected officials the donations were made to. The colloquy focuses on the relationship between public contractors and publicly elected county officials.

The Court finds this to be the true indicator of the intent in adopting the pay-to-play ordinance: to regulate the relationship between private contractors that make political contributions and subsequently apply for a public contract, and the elected county officials to whom the donations are made to. The public policy, as stated by Pozycki, and specifically outlined in the ordinance itself, is to maintain public trust in the awarding of contracts and avoid the perception or reality that political donations have an effect on the government contracting system. In other words, as stated by Pozycki, pay-to-play is directed at keeping honest the government contracting system. The relationship between a prospective contractor/donor and an elected county official does not change, regardless of what campaign the donations are being made to.

The Board of Chosen Freeholders has put forth affidavits purporting to state the Board's intent at the time Ordinance No.

10 was enacted in 2007. The court places little weight on these affidavits. While contemporaneous sponsor statements are frequently used as extrinsic aids to legislative intent, post-enactment statements of legislators on legislative intent have been disapproved; they are of limited legal value to understanding the clear meaning and legal effect of statutes. *Essex Crane Rental Corp. v. Dir., Div. on Civil Rights,* 294 *N.J.Super.* 101, 682 *A.*2d 750 (App.Div.1996); *see also Dumont Lowden, Inc. v. Hansen,* 38 *N.J.* 49, 56, 183 *A.*2d 16 (1962) ("it has not at any time [been] suggested that [a court] would approve the extraordinary course of taking testimony of individual legislators as to their actual intent or understanding when they voted upon the legislation."). While the court recognizes that a local county ordinance lacks the formal legislative history that would accompany a state statute, this does not change the underlying reason for disfavoring post-enactment statements of intent, lack of reliability. These subsequent statements of legislative history have the potential to allow legislators to informally re-write the law simply by proclaiming that they really intended something other than what the legislative history indicates. For this reason the court finds that the colloquy of the Freeholders at the August 28, 2007, meeting and the preamble incorporated into Ordinance No. 10 are the best sources of legislative history to ascertain the intent and spirit of the enactment.

It is with the preamble provisions and the legislative history in mind that the court construes the true meaning of Section 2. From the plain language of the preamble, and the focus of the discussion leading up to the adoption of the ordinance, the court finds that the Freeholders intended Ordinance No. 10 to limit contributions from private entities applying for public contracts to any campaign, including state campaigns, of prospective or current holders of elected county office. The overall purpose of Ordinance No. 10 is to create transparency and public trust in the government contracting system. This purpose can also be gleaned from the use of the words "in the interest of good government" in the preamble of the ordinance.

It is the relationship between a donor that obtains a public contract and an elected official that received the political donation that gives rise to the implication that money has been exchanged for some advantage over other eligible private contractors. Campaign contributions to the state campaign of an elected county official running for state office does not remove the taint and possibility of influence that an elected county official may choose to exhibit in favor of a contributor within his capacity as a county official. The court is of the opinion that this is precisely the type of potential for influence the Freeholders had in mind when they enacted the ordinance.

The plain language of the ordinance as a whole also provides no evidence of an intent to limit the scope to only Atlantic County campaigns. For example, the preamble states "the County desires to set maximum amounts that professional business entities may contribute *politically*." (emphasis added). Political contributions includes contributions beyond just county campaign contributions. Further, sections 2(a) and 2(b) simply state "*any* campaign committee" and not "any County campaign committee" or "the campaign committee for County election." The Court does not find that when read as a whole there is any evidence that the language of Section 2(a) or 2(b) limits the applicability of the pay-to-play ordinance to only Atlantic County campaign contributions.

To the contrary, the ordinance is clear in other instances in specifically identifying "candidate committees for elective County office in Atlantic County" as subject to those provisions. (*See, e.g.,* Ordinance No. 10, § 8(a)-(i)). This specificity in other sections leads the court to find that it was a conscious decision not to define the campaign committees in Section 2 as committees for elective county office only but instead any campaign committee. A look at Section 4 of the ordinance further buttresses the court's conclusion. Section 4 requires any professional business entity seeking consideration for the award of a public contract to provide a disclosure statement of campaign contributions. Pursuant to Section 4(b) the disclosure statement requires a list of the political

contributions to "any State, County or municipal committee of a political party." The requirement of disclosure of contributions to campaigns unrelated to county offices further indicates that these contributions are also subject to the contribution limits of Section 2.

The court does not find merit to defendants' argument that "current holder of any elective County office" is a term of art meant to include campaign contributions to county election funds in years that a county official is not up for re-election. Defendants claim that the purpose of limiting contributions to county campaigns is to level the playing field between currently elected county officials and prospective county officials. In the court's view, this misses the point of the ordinance, which is to create an honest and transparent government contracting system. There is nothing in the ordinance that expresses concerns about leveling the playing field between current elected county officials and prospective county officials. The Freeholders have a comprehensive preamble enacted which expresses the goal of Ordinance No. 10, and created a detailed scheme under the ordinance to achieve those goals. The court is impressed with the efforts of Atlantic County in enacting the pay-to-play ordinance. As stated in this opinion, the objectives of this legislation are abundantly clear, and it truly reflects the intent of the Freeholders in drafting and adopting this ordinance.

Ford–Scott also argues that because the plain language of the ordinance is open to multiple, conflicting interpretations, it is unconstitutionally vague and thus void. The court finds that while Section 2 read in isolation may be open to interpretation, when read in conjunction with the language of the ordinance as a whole, and in light of the legislative intent, as well as the public policy behind the enactment of the pay-to-play ordinance, the intended purpose is clear. Ordinance No. 10 is meant to preclude the award of public contracts to any contractor who has donated monies to any campaign of a county elected official, even when the

campaign is for an office other than an Atlantic County office. The court finds that this argument has no merit.

The court does note that in his capacity as Sheriff, Balles does not partake in the process of voting on and awarding public contracts such as the one at issue in this matter, and to be clear there is absolutely no evidence that Balles did anything wrong. However, in adopting the ordinance, the Freeholders specifically chose to include the office of sheriff as being subject to the ordinance, and not only elected county officials that vote on the award of contracts. From this the court can glean the desire on the part of the Freeholders to have a very broad ordinance, and that the Freeholders were aware of the possibility of the ordinance being subverted simply by donating to county officials not subject to the ordinance, but who share close political ties and often run together with those county officials who do vote on the awarding of contracts. Therefore, the court finds enforcement of the provision proper in this instance and in accordance with Ordinance No. 10.

For these reasons, the court concludes that the underlying purpose of the pay-to-play ordinance is to create transparency and public trust in county contracts by removing the possibility of influence that a campaign donor may have over the person who he or she helped get elected. The goal of Ordinance No. 10 is to regulate the political contributions made to an elected Atlantic County official by public contractors, regardless of the type of campaign that the current holder of county office is running for.

III. ATLANTIC COUNTY ORDINANCE NO. 10 WAS ADOPTED PURSUANT TO THE AUTHORITY PROVIDED BY THE STATE LEGISLATURE AND IS NOT PREEMPTED BY ANY STATE LAW.

*N.J.S.A.* 19:44A–1 to 47 is the state regulatory scheme governing disclosure of campaign contributions and expenditures, as well as, eligibility for state public contracts. *N.J.S.A.* 40A:11–

51 authorizes a county to establish ordinances limiting the award of public county contracts to contributors to campaigns:

> A county, municipality, independent authority, board of education, or fire district is hereby authorized to establish by Ordinance, resolution or regulation, as may be appropriate, measures limiting the awarding of public contracts therefrom to business entities that have made a contribution and limiting the contributions that the holders of a contract can make during the term of a contract.

This provision further states that the provisions of the state pay-to-play statute "shall not be construed to supersede or preempt any Ordinance, resolution or regulation of a unit of local government that limits political contributions by business entities performing or seeking to perform government contracts." *N.J.S.A.* 40A:11–51. Therefore, the state conferred not only the power to enact pay-to-play ordinances on counties, but also ensured that these ordinances were not considered preempted by the state law.

The only limitation this court finds that Ordinance No. 10 imposes is the award of county contracts to contributors of monies to an elected county official for whatever purpose. A contractor is free to contribute to a state campaign of a current county official; however, to be considered for a county contract a prospective contractor must abide by the county pay-to-play ordinance. Only the right to contract with the county is impacted; a persons rights under state law is in no way impacted, and thus, no state law preempts the ordinance as the court interprets it.

In adopting the ordinance the Freeholders recognized precisely this concept:

> Mr. Pozycki: It's—as you can imagine, this is something that isn't just broad. It's a contractor who has a *voluntary* ability to do it. They can make all the contributions they want. But if they want to get into the arena, the negotiation of the public portion purse strings payment of a contract to them, then they have to abide by the contract pay-to-play rules.

The ordinance is intended to be narrow and to only impede the ability of a private contractor to contract with the county after they make a voluntary decision to donate beyond the limits proscribed by the ordinance.

The state pay-to-play statute, on the other hand, restricts contributions as they relate to state contracts only. Therefore,

the state's ability to contract with donors remains exclusively subject to the state pay-to-play statute. It is also important that the state has conferred the power on local government to create their own pay-to-play laws which exclusively dictate the effect of campaign contributions of any type on the ability to contract with the local government and not with the state. For all the reasons stated above, the court finds no merit on the preemption argument. The political contributions made by Ford–Scott to the State Senate campaign of Balles are subject to Atlantic County Ordinance No. 10.

For the foregoing reasons, the court finds that the political contributions made by Ford–Scott to the State Senate campaign of Balles are subject to Ordinance No. 10. The penalties outlined in the ordinance are applicable with the exception of Section 7(c). The court finds that Section 7(c) sanctions are improper as Ford–Scott has already performed and been partially paid under the contract, and this work was fully completed even before the filing of this complaint. To impose such sanctions would require the county to hire a new auditor, which would cause a hardship and impose a financial burden on county taxpayers. Judgment is entered in favor of the plaintiff in accordance with this opinion.